## Addendum to March 2nd, 2023 motion for new trial submitted by Damon M. Beckley

1. For nearly two years I had been asking attorney Aaron Dyke for the exculpatory evidence in my case which proves as per my long-standing testimony that I was <u>the</u> person helping approximately 15 trapped and afraid police officers to escape the building (and potential harm) on January 6th. This evidence was withheld by the DOJ and the prosecution in my case until November of 2022, when some of it was sent by them to Mr. Dyke. They claimed (according to him) that they had yet, as of then, been unable to locate any such evidence, yet they traced my steps for the whole time I was in the building and cherry-picked evidence that they presented at trial. The fact that they located (some) of the exculpatory evidence and sent it to Mr. Dyke proves they had definitive knowledge of such exculpatory video footage as *being in existence*. Mr. Dyke had even flown to DC to visit the Capitol Building in the latter part of 2022 *to trace my steps on foot personally* so there could be <u>no question</u> in his mind as to where I entered the building, the direction in which I travelled through it, and my path in exiting as well. So, there is no mystery: the prosecution had previously *fully established* my *definitive path* before presenting it to Mr. Dyke in DC that day.

2. Mr. Dyke then chose to sit on the exculpatory evidence supplied to him by the prosecution and not notify me of its existence. I was neither shown the videos nor notified that they were in Mr. Dyke's law firms' possession. I was then admonished *strongly* by Mr. Dyke to move forward with a Stipulated Trial where he said if any exculpatory evidence were to ever be found after the trial, he would then use it to work towards securing a lighter sentence on my behalf. He also told me that *it* (the stipulated trial) was my best path moving forward since there was no way I would get a fair trial in the District of Columbia. I was nearly vehement in my assertion to Mr. Dyke that I wanted the fact that I had helped those police officers to be included in the stipulations, but neither the prosecution nor Mr. Dyke would allow it, stating there was no video proof of my claims to those facts. This is a blatant example of unethical actions taken against a client and definitive proof of misconduct on both my (then) counsel, Mr. Dyke and the prosecution (this will be further demonstrated in the paragraphs below.)

3. The prosecution then discussed points of alleged guilt (from the videos they claim are inculpatory) with myself and Mr. Dyke that they *would* allow to be included in the stipulations, whilst making sure that exculpatory videos that exist, (some of which had already been supplied *by them* to Mr. Dyke's law firm) were <u>not</u> included in the stipulations. Believing I had no other choice but than to sign onto the formulated stipulations (that I strongly disagreed with otherwise than believing I had no shot at a

fair trial) I reluctantly signed the paperwork. I was also threatened with enhancements being added back in if I went on to a jury trial.

I was in excruciating pain that day due to suffering from TMJ. I had mentioned this to Mr. Dyke during small talk shortly after my arrival to his office, so he was aware of the fact that I was dealing with a recurring painful health issue. Nevertheless, Mr. Dyke assured me I was doing the right thing in moving forward with the stipulated trial.

All the discussions between my representative and the prosecution were done in my absence. I do not know if this is typical protocol. Then the paperwork was submitted to the court. Afterwards, the stipulated facts were changed and agreed to in my absence once again by Mr. Dyke and the prosecution and I was asked to come in to sign the paperwork a second time, (so I did,) then right before walking into trial on that February day, I was notified by Mr. Dyke in front of family and friends that some facts had once more been adjusted and he rushed to get my signature added to a *third set* of stipulated fact documents.

These documents were all submitted to the court three times. In all three instances the prosecution knowingly and purposefully excluded exculpatory evidence that had been supplied *by them* to Mr. Dyke from being included in the agreed upon stipulations (and against my constant disapproval.) Keep in mind that even up to and including the time in the actual trial itself, I had no knowledge of the exculpatory evidence that had been supplied.

On a call with Ms. Staft after she had accepted the case, I told her that there was exculpatory evidence that *had not been included* in the stipulations for the stipulated trial, but she was somewhat skeptical since no video of an exculpatory nature (according to my descriptions to her of events that unfolded that day) had been included for presentation *at* trial. She asked if I had seen this evidence and I told her that I had not but that I knew it had to exist. I told her about being knocked down violently and about helping the police. She said she would talk to DOJ to see what could be located. She called back the next day to say she had found some of what I had been describing in documentation and video files turned over by Mr. Dyke's law firm and that's when she asked me if I was aware of the existence of *those* videos and as previously stated, I replied to her truthfully that I had no knowledge of them.

I had told her of an NPR story that was published in the fall of 2022 about a Capitol Police officer named Tariq Johnson who had told of his actions that day to assist a group of police officers that were trapped and trying to get out of the building. These were the same officers that I had been helping create holes for through each consecutive area from the House Chamber doors where they (and I) were all trapped (by the crowd)

leading all the way to the East Rotunda Porch (as hundreds more people were pouring in.)  This was a difficult task.

On my discovery of the NPR article, (which occurred two days before the stipulated conference between myself and Mr. Dyke – and the prosecution when he would leave the room to go talk to them), I was ecstatic because it completely corroborated my testimony which I a) had made on Facebook in the days immediately after January 6th, b) had stated to Special Agent Theodore Jones upon my arrest in that same month, and c) which was also claimed by me over and over to Aaron Dyke.  I also sent a link *to the article* to Mr. Dyke because I wanted the it included in the stipulations for the stipulated trial but he said that the prosecution came back and reported to him that there was *absolutely no evidence that I had helped the officers in question to escape the building* or to create a path for them to escape (which was what I was doing for most of the time that I was in the building,) that there was only video of me standing next to the crowd *on the edge* of the formed pathway (or *hole* as officer Johnson had described as having already been made for him, in the NPR article.)  That same terminology was the exact wording that the officer in charge of the trapped group of police I was aiding to escape the building used when he initially asked me for my help, and I quote him: he said, "Make a *hole* and we'll get out of the building."

Ms. Staft found video supplied to her by Dyke's office which they had in their possession as far back as November of 2022 which shows me at the top of the East Rotunda Porch steps using a megaphone to get the crowd on the steps to make a hole so that the police could get out of the building.  In the video I'm audibly making the directions to the crowd.  This is exactly the type of evidence I had been begging Mr. Dyke for nearly 2 years to be recovered for my case (which he had for months prior to trial but kept me unaware of it.)  The video was shot by a journalist, so it was not part of the surveillance video (captured on film by security at the Capitol Building) which shows that definite determination to find this video had been successfully completed prior to Ms. Staft's receiving the video by someone at the DOJ or possibly by Mr. Dyke's "contact" there, who had supplied him with it. Incidentally, it could be the same person (but is unknown to me.)

Ms. Gretchen received the video from Mr. Dyke's law firm when they sent her all parts of the case, including said exculpatory evidence, and upon her discovery of its existence in the body of evidence turned over to her by Dyke's office, it was then that it was asked of me by her if I was aware of the existence of that evidence.  I notified her that I was never made aware of it, or the fact that it was in the possession of Mr. Dyke's law firm, although I knew it had to exist, since I knew what I did or did not do while in the Capitol Building on January 6th, 2021.

I also told her I had been asking for that particular piece of evidence and other videos for going on two years.  This all points again to intentional misconduct by the

prosecution to mislead the Court so that the result they were seeking (a conviction) would be clenched by them.  It's very likely that had I went on to sentencing with Mr. Dyke as counsel, that no exculpatory evidence would ever have surfaced. Since Mr. Dyke identified himself to be a Democrat early on in his counsellorship to me, I now believe his actions to further be politically motivated in nature.  He had told me that "Regardless of my political leanings, you're an American and deserve the right to fair representation and a fair trial and I will work to get you the best result for you and your family."  I took him at his word but apparently prison time is more of what he had in mind, not the opposite.

4. Lastly, I plead *nolo contendere* to my original two charges and was told by my former attorney that the prosecution was not accepting pleas at that time.  I was not told by my counsel that a plea of nolo contendere is not allowed in federal court cases. (Ms. Gretchen's assistant enlightened me of this fact *a full two years later* during our very first meeting.)  The prosecution subsequently removed the original two misdemeanor charges and added four new ones along with two felonies with what I surmise to be *no new evidence* than what was used to allege the first two charges.

So, the prosecution proceeded to repeatedly request to set aside my right to a speedy trial (which was agreed to by Mr. Dyke, but never by me) for a good year and a half to build a case against me based on untruths, omitted exculpatory evidence, and inculpatory evidence (as presented at trial) based on videos of me which had their context of actual exculpatory nature *removed* so as to claim their *contrived inculpatory nature* created via cleverly chosen starting and ending points of the prosecution's presented edits of said videos (which would showcase best for them at trial.)  Another example of (and in this instance) *egregious* prosecutorial misconduct.

I was told by Mr. Dyke that the prosecution had used the <u>length of time I was in the building</u> and the fact that I had exited and re-entered the building *repeatedly* as their basis for switching to the four (then new) misdemeanor charges [plus the 2 felonies] when they know that for half of the time I was in the building that I was helping the police and that my repeated entries were also done at the behest of those same police officers, so the changes to my original charges are also *more evidence* of prosecutorial misconduct.

They also know that I originally entered the building searching for one of the rallies' organizers and that looking for that person also took a considerable amount of time and was the reason for my continued travel inside the building as I felt I would find this person if I kept searching for him.  I found out a couple of days afterwards that he *held a permit* for his news organization to be filming from the roof of the Capitol Building and that is why he entered the building.  He also paid for then President Trump's security,

staging, perimeter fencing, etc. at the Elipse rally that day. There is video evidence that will prove my vocal inquiries of people in the crowd on the East Rotunda Porch that day as to this person's whereabouts (once obtained,) because he had been speaking using a megaphone only moments before but I couldn't hear what he was saying and then he disappeared (into the building I would find out from a person in the crowd minutes later.) But once again, Mr. Dyke refused to acquire such evidence on my behalf though I had requested it many times, citing its relevance to the case; I had not entered the building to protest anything but initially to seek out this individual to ascertain what was happening because when I arrived, the scene outside seemed like an extension of the rally, but there were no special speakers making any engagement with the crowd or entertainers performing, or emcee directing or informing attendees of the (perceived) rally extension *of what to do next*. These facts were discussed *repeatedly* with Mr. Dyke.

There was also video I had submitted to Mr. Dyke showing that when my party arrived on the east side of the Capitol Building an hour+ after leaving the Trump rally early (to go find restrooms) proves we had no knowledge of any violence happening in that section (as it had already occurred,) and it also proves my calm demeanor upon our arrival. I also took time while in the building to search for a new recording device that was knocked out of my hands during a violent attack from behind that I fell victim to. Mr. Dyke nor the prosecution would allow this to be entered into the exculpatory evidence either. They said there was no evidence of this, but it was in the evidence supplied to Ms. Staft upon her acquiring my case.

*Women for America* had obtained permits to hold the rally at the Elipse and on the Capitol Building grounds that day, so as far as I knew, I was in the right place because that's where the crowd *was* when I arrived at the Capitol Bldg. I did not take part in the "march" from the Elipse to the Capitol Building. Six permits were granted in total by the Capitol Police. The cutoff on the permits was 6 pm. (I left well before then (shortly after the police I had been helping had exited the building.)

I also told Mr. Dyke that when parking near the Capitol Bldg that I had conferred with a Capitol Police officer near the Capitol Grocery as to where I could park to avoid getting a parking ticket. She did not inform me of any problems occurring at the Capitol, so I parked my car next to the loading dock at the Capitol Grocery and proceeded on foot toward the Capitol Building. This is also provable by Google Maps timeline, but Mr. Dyke was uninterested in this information, but it demonstrates that I'm not the type to come looking for trouble.

Mr. Dyke also was not truthful in his reply to my March 2nd motion stating that "He and his firm had *strongly recommended against my Pro Se motion*." This is absolutely <u>*false*</u>. They had zero knowledge of it as I had never discussed it with them or Mr. Dyke because

he was not answering my calls for the entire week plus after the stipulated trial. He only responded after his firm had been notified of my *Pro Se* motion. He had said that he had given me his personal cell phone number but after I had decided that my sleep deprivation and meds had in my mind constituted a need to motion for a new trial, he was unavailable and the voicemail of the cell phone number he had given to me had an outgoing message from some unknown older male.

So, in conclusion to this addendum, I want to be clear for all that a bench trial is what I am seeking. I appreciate His Honor, Judge Boasberg for telling me during the stipulated trial that I have a right to choose to do just that. I humbly accept and elect this option, (if the court and the honorable judge will allow.)

Respectfully submitted,

Damon M. Beckley