# AFFIDAVIT of Damon Beckley

CASE NO. 21-CR-285 (JEB)                                                                          11/05/23

Hello, my name is Damon Michael Beckley of Cub Run, a very small, rural community in Hart County, (South Central) Kentucky. I'm currently 55 years old. I'm married and have three sons ages 25, 19, and 12. I make a living as a small-time contractor. My family and I work together doing residential building and remodeling. We also build decks, do property maintenance for some of our customers, and we dabble a little in real estate. I'm an entrepreneur; the CEO of a yet to be released tech project called Occident, (a super app being built for the West,) and I am an inventor. I have invented multiple tools and apparatuses for a variety of industries focusing on safety and productivity in construction environments. I'm an accomplished musician; a percussionist and drummer - experienced with different groups, ensembles, and churches going back to the early 1980's.

In the following statement, I give an account of events as I experienced them unfolding on January 6th, 2021, in and at the Capitol Building (and Grounds) in Washington DC, United States, our nation's capital. I will also detail how events transpired afterwards, leading up to my stipulated trial on February 23rd of 2023, where I was, in my opinion, *wrongfully* convicted due to actions now known to have been taken by my former public defender, Aaron Dyke, esq., (of Louisville, KY,) who coerced me into the stipulated trial and who also conspired against me to lead the court into handing down that conviction. I swear that these events are true to the absolute best of my knowledge.

In late September of this year, I did a Google search on my own name. During that search, my wife, Carla and I (hereafter "we" and/or "us") discovered a website called <u>courtreporter.org</u> and we visited said site. There, the both of us were able to review all actions purportedly entered into the record in the above styled case. We found that the DOJ had sent my previous attorney, Aaron Dyke, some 167 items of discovery, a fact that until perusing courtreporter.org was previously completely unknown to us. This truth of the government's 167 item discovery being disclosed to Mr. Dyke was never discussed with neither my wife nor I, by him, nor anyone else from his office or otherwise for that matter.

We learned that the government had twice disclosed its intention to seal evidence regarding police body camera footage from 01/06/21, stating sensitivity concerns to Mr. Dyke for the purpose of making objection. He allowed the window to make that objection to expire without ever mentioning anything to me about my rights regarding the governments' motion to seal. More importantly, had he disseminated that knowledge to me at that time, he would have alerted me to the fact that the 167 items of discovery had indeed *been* disclosed to him by the DOJ on May 21st, 2021, which would have in turn alerted me to his possession *of* it. But he kept me ignorant to that disclosure for the <u>whole duration</u> of his time representing me.

I had asserted to Mr. Dyke repeatedly throughout his tenure as counsel that there must be video evidence to prove my claims to him that my actions that day were contrary to the DOJ's allegations/final versions of charges against me (and previous ones as well) because I knew what I *did or did not do* while in the Capitol Building that day. But Mr. Dyke kept stating that no such evidence had yet been discovered. In late 2021, Mr. Dyke said "If any evidence is found to support your claim, we'll definitely use it at trial. I'll be looking and you guys are welcome to look as well. Check internet forums or social media and see what you can find. If you find anything, forward it to me."

In early January of 2023, Mr. Dyke reiterated that "if we (Carla or myself) were to find any such evidence supporting my claims in a public forum, we were certainly welcome to submit it to him and he would forward it to his tech guy in DC for authentication purposes and once authenticated, we'll try to use it."

On or around January 19th, 2023, shortly before Mr. Dyke talked me into going with the stipulated trial, we did find one such article that had been published by NPR in November of 2022, depicting the account of former Capitol Hill Police officer Sgt. Tarik Johnson, where he recounted helping 16 of his coworkers, a group of Capitol Hill Police officers that had been trapped by the swelling crowd in front of the House Chamber doors to escape the unruly crowds in the building. Sgt. Johnson's account corroborated my own story that I had posted about in a Facebook post I had made on January 8th, 2021, depicting my assistance to the same group of officers.

In January 2023, during a speaker phone conference between us and Mr. Dyke, (he was aware that we were both on the line as he was answering questions from us both during the call) we pressed him again about using the NPR article and he said that "it had not yet been authenticated but if it indeed is authenticated, we can try to use it in sentencing, but keep in mind, no video evidence is being claimed to be in existence of you helping the police according to the DOJ." Carla then said "Let me get this straight: So, if we find something exculpatory in nature it can be used to argue for less time at sentencing but not to show to the judge at trial? Why can't we just show it to the judge? So, you get to have your trial, be convicted, and then argue for your innocence or make your defense at sentencing?" Mr. Dyke said "Yeah, that's pretty much how it works" which then turned into a shouting match between us and him because we were taught otherwise our whole lives.

I texted the NPR article to Mr. Dyke, but he, to my knowledge, did *not* forward said article to the DOJ on my behalf (as I begged him to do) for verification and to be entered as evidence to corroborate my testimony from nearly two years prior made to agent Ted Jones (and which mirrored the previously mentioned Facebook post.) Both accounts were entered into the body of evidence in my case by the DOJ. He said, "If you want to include social media posts for your defense, then the prosecution can use the same to prosecute you, so you don't want to do that." Funny thing is, the DOJ used social media posts against me anyway, and I was steered away from using that evidence as a defense.

Around the time that I was to be included in negotiations to agree upon a set group of facts pertaining to the stipulated trial, I had been frequently suffering from TMJ and other mouth problems, including on the day I was supposed to be conferencing with Aaron Dyke and the prosecution to formulate the above-mentioned body of facts. Aaron was aware of this because I mentioned it to him when I had arrived at his offices in Louisville. I asked him if he had ever heard of the condition, and he responded that he had. I told him that I had suffered the condition for 20+ years and that lately, the pain had been more severe than in times past. He said he was sorry to hear that and then we moved on.

So, I was there but was not allowed to be an active participant in the same room for the negotiations between Dyke and the prosecutors. I did not pick up on the fact that the prosecution was using my social media posts against me in the stipulated facts, and I was unaware that I would not be arguing against anything in those stipulations at the trial. That's why at trial I told the judge that there were other facts (those being of an exculpatory nature) but I still did not understand that I wouldn't be able to say anything additional regarding any of the stipulated facts during the trial.

Even when the judge told me, "You understand we're only going to be using the facts in this document?" I responded "yes" then tried to get Mr. Dyke to get up during the prosecution's presentation to object to some of the stipulated facts and he said, "We're not arguing this now." I was at that moment still suffering from severe sleep deprivation, TMJ, and having a narcotic pain pill that my friend who attended the trial that day had given me (out of sympathy, he is a paramedic and had seen how bad I was suffering with the TMJ) and also my wife had given me Ibuprofen and Benadryl when I couldn't get rest the night immediately preceding the trial, (which is a combination given to convalescent patients to get them to go to sleep.)

So, I was truthfully unable to think clearly when agreeing to move forward with the stipulated trial. Furthermore, when the judge asked me if I was under the influence of any medications or had any conditions which may render me incapable of making rational decisions, I responded "No" because I literally was so out of it that I didn't recall taking the medication and couldn't think of the fact that I'd had nowhere near enough sleep to properly function. The main thing that I could recall at that moment was that of having had been warned by Aaron Dyke that I would not get a fair trial in DC, so I froze and could only think of that and moved forward with the stipulated trial.

Dyke not allowing me to be in the room for the negotiations of stipulated facts would give understanding as to why he appeared so many times in my absence to make motions for continuances stating a "need for more time to go over discovery." He wanted the courts' perception to be that he and I were 'working diligently to piece together a defense' when that was quite the opposite of what was taking place. Phone and email records along with surveillance video from the Office of the Federal Defender in Louisville, KY will all bear out the fact that from the time Mr. Dyke accepted my case on May 7th, 2021, until September of the same year there was nearly zero contact between the counselor and myself. In fact, other than

his initial consultation, I had to call the public defender's office in DC *twice*, (once in July '21 and a second time in September) to talk to David Bos to inquire as to why I had heard nothing from Aaron Dyke. He finally called soon after my conversation with Mr. Bos that September.

As to his billing 199 hours on the case; I'm not sure the reasoning because I was only summoned to his office a small handful of times, mostly concentrated to the time before trial when I was coerced into agreeing to go into a stipulated trial by Aaron Dyke in late 2022 and/or early 2023. He actually stated that "They've got this new thing they're doing in these J/6 cases in DC now Damon called a stipulated trial. If you agree to move forward with a stipulated trial, you will get to skip having to go to a trial by jury, but you still get to take off three of your enhancement points by admitting guilt. My boss was like, 'Are you serious?' because we had never heard of anything like this before, so we were really excited and my boss also said, 'wow, if that's correct, we should see if we can use this angle for other j/6 cases." He said this to get me amped up on the idea to sell it to me. My brother-in-law afterwards, who had spent his career of (then) 25+ years as case worker for Child Protective Services said "That's some bullcrap. We use stipulated trials all the time at CPS, that's not a new thing."

Mr. Dyke's office would however send notification of motions granted by the court via U.S. mail. For most of the duration of the case under Mr. Dyke's tenure as my public defender, this would be the surprise way we would find out something had actually happened in the case.

Additionally, we were unaware (also according to the DOJ via courtreporter.org,) that Mr. Dyke was prompted by them some six times to make an appointment to travel to the District of Columbia to go through the Capitol Building to gain better understanding as to what my whereabouts were in the building that day. Perplexing. Their statement (also on the website) regarding this was one of clear frustration; unsurprisingly. What was the purpose or reasoning behind his repeated delaying progress in the case?

Considering these discoveries, I would like now to apologize to the Court, to the Prosecutors who worked on my case, and to Hon. Judge Boasberg for my previous accusations that the DOJ had colluded with Mr. Dyke in keeping discovery from us. We now realize that (to the best of our current knowledge,) the government did their job correctly in providing said discovery, so we appreciate that and thank them for it.

As far as the prosecutions comment in its objection to my Motion for a New Trial as to "...no affidavits or supporting evidence had been attached," besides not being astute in matters regarding the law, timetables thereto, or other rules, etc., I give the following facts;

   a) I had no knowledge of said discovery having had been shared with my attorney by the DOJ, and
   b) Without that knowledge, I didn't know what my options were or how/what to write concerning them as far as where any affidavits would have been concerned,
   c) how said affidavits were/are to be accepted by the court, and so,

d) these facts rendered me ignorant to the process, thus inoperable to the common practice of including such items within or attached *to* my motion and subsequent addendum to such.

Furthermore, Mr. Dyke asserted to me before my trial that "affidavits, and letters from friends and family on your behalf that you may want to give to the judge can be presented to him during sentencing as points for mitigation to lessen your sentence." He also said that "...you should send them all to me as you acquire them so I can send them to the judge all at once." With everything that has transpired, I don't necessarily believe I would have gotten to sentencing to find the judge would have had the chance to review any such materials, because I feel he would never have received them, but who could know? One thing for sure is that the NPR article was not forwarded by Mr. Dyke because it was *not* found on courtreporter.org.

We now believe (although without 100% certainty) that the actions taken by Mr. Dyke to most likely have been all his own. There may have been others involved, but in either regard, we feel an investigation should be carried out to get to the bottom of this matter. And so, in conjunction with the Motion for Access to Discovery, I also request that these matters be investigated and that a Motion to Vacate be considered on my behalf.

Isaiah 54:17 says "No weapon formed against you shall prosper..." These actions described above are what amounts to a weaponization of the office of a counselor, against me. It's much worse than mere ineffective counsel; my conviction is a direct result of Mr. Dyke's successful efforts to take justice into his own hands, as he believed me worthy of jail time for participating in a protest involving Donald Trump. In an act of full disclosure during his initial consultation with me, he described himself as "Being on the other side of the isle than me but that as an American, I deserved fair representation" so I took him at his word.

He did anything but give me fair representation. He impeded the ability of the judge to weigh all the evidence in the case by controlling what evidence would be submitted for view during the stipulated trial. He knew a conviction would be the result in that trial since he was successful at exculpatory evidence being excluded from it in the facts stipulated.

Every time I would say to him that "There has to be evidence of my helping the police that we can include in these facts" he would reply that "there had been no such evidence found". Since my presence wasn't allowed in the room where the consultation with the prosecution to compile stipulated facts was taking place (I was in his office, but that conversation was happening in another room) I had no control and little input as to what was being included in the stipulated facts.

I wonder, has it occurred to anyone that no exculpatory evidence was included in the stipulated facts? And has it occurred to anyone that no one in their right mind would agree to go into a stipulated trial where there would be no exculpatory evidence allowed unless coerced? I very reluctantly signed onto the agreement because Mr. Dyke told me there was no way I would get

a fair trial in DC. He stated "90% of DC voted for Joe Biden, and everyone who has went to trial in these Jan 6th cases so far has gotten convicted, so this stipulated trial is the best route for you to take. You will not get a fair trial in DC." He really did make me feel as though I had no other choice. Merriam-Webster defines coercion as follows:

> "The use of express threats of violence or reprisal (as discharge from employment) or other intimidating behavior that puts a person in immediate fear of the consequences in order to compel that person to act against his or her will."

Mr. Dyke made no threat of physical harm to me, but he absolutely intimidated me into signing on for the stipulated trial with his narrative of the situation I was facing being very unfavorable for me.

So not only was I coerced, but the evidence was completely tampered with by Dyke, his thumb weighting the scale of justice to shoehorn me into the conviction he believed I deserved. I personally feel Mr. Dyke should be investigated and if these allegations are substantiated, his license to practice law should be subject to revocation.

Furthermore, he should be indicted and tried because he has broken laws and what he has done contributed (in my humble opinion) to a gross miscarriage of justice and if I am to be sentenced under these auspices, it's a grave injustice to my family. No person who tried to get people to calm down in that insane situation, and furthermore, that helped the police for the next ½ hour *at their behest* should have been charged with counts one and two, (as in my case,) or convicted of them. I did not act corruptly. Unlike counts one and two, my original two charges of trespass and disorderly make much more sense. I would like to think that even those charges in light of helping police officers would likely have been looked at less severely in most courtrooms [outside of DC] had all of the evidence been presented. But it was not.

Judge Boasberg at trial, when asked by the prosecution if he was able to view the videos included for the stipulated trial ahead of time (as is customary) replied that "he had not." Then he asked "I have an event to attend this afternoon, so can we edit these 40 odd minutes of video for brevity's sake?" which was agreed to by the prosecution. This removed all the more context from my actions, making any shred of evidence decipherable as possibly being exculpable in nature, to absolutely disappear, when in fact some of that video evidence could be considered exculpatory. And since at a stipulated trial I could not object, it stands otherwise.

One thing that has been credited to me as being inculpatory by the prosecution instead of what was exculpatory behavior was the facts surrounding my repeated exits and entrances into the building. I've been painted as some deranged protester who just couldn't seem to get enough of the action, repeatedly going against officers who were being impeded by me as I made those additional movements either leaving or re-entering the building, from being able to discharge their duties of keeping (me or possibly others) from the process of being forced out or kept out of the building. This couldn't be further from the truth. So, I will detail that below.

In a video taken by a journalist from PBS outside the Capitol Building that day, the camera person zooms in on Jacob Chansley, the man dubbed by the media as the "Qanon Shaman." I can be seen (and heard if a playback device has enough volume capability) in that video getting the crowd on the steps to make room for the above said officers to be able to safely pass through. I asked Aaron Dyke for nearly two years to find video corroborating my testimony that this was fact. He repeatedly claimed that according to the DOJ that they had kept claiming no such videos existed, yet the video that does absolutely and clearly show that I was helping the police was found to be in his possession by Gretchen Staft when she took over the case from Aaron Dyke. The firm he works for in Louisville gave her the video when they turned over all elements of the case to her.

After she received the materials from them, we had a consultation (in Dyke's firms' Louisville offices.) I explained to her afterwards that I had asked Mr. Dyke many, many times to find videos that prove I was actively helping the police that day and that up and to the time in which she had agreed to represent me, which was after my stipulated trial, Aaron Dyke had maintained that there were never any such videos found.

Ms. Staft found the above-described video that had been in Dyke's possession. As she went through it (it's some 12 hours long, approximately) and she found the section in the video that does prove my claim. She then called me to notify me that she had emailed me that particular video (among a couple others) and she asked me to view them and call her back to let her know if I had seen them before, so I did. When I called her back, she asked me if I had ever seen the video proving that I was helping the police and I told her that I had not seen any of the videos she had sent me.

I then asked her if she would be willing to come to the court for me to allege Aaron Dyke of ineffective counsel, but she made it clear that she was not. She said that she believed that she could get me a new trial, but going as far as the ineffective counsel was beyond what she was comfortable with. My wife was with me in the car during this conversation and we were both dismayed by her choice, but it was hers to make. At that time, I told Ms. Staft that pursuing Dyke on the ineffective counsel was a must have to continue the relationship, so it was decided amicably at that moment to ex parte. I respect her decision and appreciate her being my backup counsel.

On January 6th, 2021, the leading officer of the group of 16 (who were trapped by the swelling crowd that was pushing them into the narrow hallway that leads to the House Chamber doors) asked myself and another gentleman (who I'd say was in his mid-60's) as we were there near the House Chamber doors to "Make a hole and we'll get out." The officers had entered the hallway after some of us had been there for twenty some minutes conversing with the Congressional Special Detail about the Constitution, rights of citizens, etc., to explain our views of the situation. This is partially the same crowd that I had tried my best to get to calm down 20+ minutes earlier, except at this point it was getting quite larger. I don't think those of us near the doors of the House Chamber realized this, but it's evident in the verified video by "Jaden X" that

the crowd had become *really large*, and an overwhelming number to be in that space. Shortly after, the 16 officers had made their presence known. They worked and forced their way through the crowd to get themselves situated between the House Chamber doors and the crowd. Their position became problematic for them when they were only 16 and the crowd bearing down now numbered much more than the few dozen who were originally there, and now had grown to be hundreds. My previous efforts to get the crowd to be calm and commit to non-violence in front of 5-6 officers had 0 effect on those who had came after. I think it's less than conspiratorial at this time to mention that many activists were in the crowd, and they absolutely had a bearing on the mood of those in the building and the people outside it. I had been to four Trump rallies, including the one that day at the Elise and had never experienced anyone in any of those gatherings as having been behaving in such a manner as these people were.

The crowd started bearing down on the officers.

This was bad. I was face-to-face with the leader of the group. I actually had to have both of my hands up and they were on his chest so that he and I were not forced to touch faces because the pressure was so immense coming from the crowd behind me (now numbering in the hundreds,) that all of us at the front were being crushed. I didn't want to kiss the poor guy, so my hands were up, but I am 100% certain that he would testify to the fact that I was not pushing him. He and I had a small conversation about the situation; we talked about the election, the Constitution, our families. He told me that he was the same age as me.

I recently still-framed a screenshot of him from one of the videos the DOJ had to try and identify him to maybe be able to get him to testify as to the validity of my claim that it was he who had asked me to "make a hole", (if indeed I am granted a new trial.) So far, I've been unsuccessful at finding out his name. I wish I would have asked him. He struck me as being a really nice guy.

A younger guy in the group of officers, I'd say he was in his late 20's, dark-haired and kind of slim, started to get panicked. The officers were losing the shoving match. They were only armed with telescoping graphite police batons, so they were no match for this crowds' ability to bring the pressure. The younger officer became even more anxious than before. He kept looking forward at the crowd, to his right to the officer in command (in front of me) and back repeatedly and then fearfully inquired upon his superior "What are we going to do?!!" (This is making me emotional right now...) The frightening nature of the situation was quickly escalating. It became obvious to us all right there that something had to give.

Here I was, I had gone into the building looking for Alex Jones to find out what we were supposed to be doing, (regardless of how people view him, he is somewhat of a defacto party leader and has a large following.) I'd never found him because he had entered the building and immediately gone up the stairs to go to the roof, so my search for him ended at the House Chamber doors (where he was not,) and here I was now trapped with these 16 officers. That was the moment that the officer in charge made the order: "Make a hole and we'll get out."

Had they been armed with handguns or rifles utilizing chemical deterrents or rubber munitions, they would have been able to get that crowd to turn back. Without such, they were powerless against them. It had to have been God's guidance and grace that more people were not killed right there in that hallway because the Congressional Special Detail, who were armed with handguns, could have easily fired into that crowd.

At least one of them did fire towards the hallway. A live round absolutely was fired at the glass in the door adjacent to the one with the glass broken out (that everyone has seen on the news.) I know this because the plume of glass from that shot landed square on my chest (right over my heart.) It didn't dawn on me what had actually ocurred until a couple of days later. I'm certain I could go to FOIA.gov and make a request to obtain proof that the glass in that door was indeed replaced. This whole situation was harrowing to describe even today, nearly three years later.

The older gentleman and I immediately went into action. There was no time to waste. We turned towards the crowd (both he and I are visible in the Jaden X video that has already been validated, a portion of which was submitted at my stipulated trial) and started getting the crowd to move away. Since we were "protesters" not cops, the crowd started complying, thinking they could take the building over once the police had gone. One man in the crowd tried to remain and I told him to "get turned around and leave." He exclaimed "they can't kill us all" to which I replied (because I had better knowledge of the situation) "Don't be a fool. They've got several guys with Glocks pointed at this hallway right now." The man finally turned and left.

We repeated this same action until it was only me that I can recall who was making the hole for the officers. At the beginning (or entrance) of each successive room/area/or hallway, the commanding officer would tell me again to "Make a hole." I would clear that area and go back to the entrance of it to tell him it had been cleared for them, and the officers would go through that area. This was repeated several times as there are many areas in which a hole was needed to have been made for them. As I recall there were at least six, and this only got them to the exterior doors where I was once again told by the commanding officer to make a hole on the East Rotunda porch. I went out onto the porch, got the crowd to comply, and returned inside to let the commanding officer that it was done. This time he said "No. I mean all the way down to the ground." So I went back out another time to the top of the stairs leading to the ground below to get compliance from the many people on the steps so the officers could make it safely to the ground. This is when the PBS cameraperson zoomed in on Jacob Chansley. (See video at https://ia804s0s.us.archive.org/11/items/cCf3FXfBrAariPnch/Pro_Trump_protesters_gath.mpeg4, time stamp 3:07:33 to 3:10:22.)

I then returned back inside again to the commanding officer to let him know it was done. See Exhibit 1. This is about the time that Sgt. Tarik Johnson ascended the stairs (unbeknownst to me) to assist the officers. I guess at some point during our flight from the House Chamber doors, one of the officers (perhaps the one in command) radio'd for help to flee the situation asking for back-up. Sgt. Johnson is the officer who answered that call for help.

He has been interviewed many times since that article was published, even by Tucker Carlson about his part in the account. I would like to meet him. It's an incredible story and one that

should have been allowed to have been told, but for Aaron Dyke, it has remained buried in a web of deceit, lies, omissions, and cover-ups, unfortunately.

Upon one of my times of going outside I encountered a young man who had recorded the situation of Ashley Babbit's death on his phone. I became more emotional at the news of this and afterwards granted an interview regarding the situations that had all unfolded to a small independent news group called News 2 Share, in which I unjustly excoriated then Vice President, Mike Pence, among other comments that put me in let's say, a less than appreciative light. But the point of this recounting of helping the police was to point out that my repeated egress and ingress of the building was because I was asked to by the police for *their* purpose of safe exit of the same.

In my plea of Nolo Contendere to my original federal charges of trespassing and disorderly, I included an apology letter to the Vice President for my indefensible comments, but I do not know that he ever received it.

Lastly, in our discoveries we learned that the DOJ included photos at trial of a man with an uncanny resemblance to me who was photographed being in DC on January 5th, 2021. This was a case of mistaken identity as I was not in DC until late in the morning the following day. That potentially put me in a bad light for the Grand Jury, (I don't know for certain,) as it made me appear as though I was there planning to go into the Capitol Building the next day, but I was neither there that day, nor planning anything except to attend the rally. See Exhibit 2.

I have included screenshots of my wife's Google timeline to show all our movements. We were listening to the Lance Wallnau prophecy program on the night of the 5th because he was discussing the legitimacy and factuality of actual permits being issued for people to legally rally in DC that weekend and whether or not they were truly obtained before we eventually decided to move forward with our plans to go to DC (on his word that there were legitimate permits,) which meant were having to leave really late that evening to head to the rally. See Exhibit 3.

We were together traveling from Kentucky all the way to DC and were together until the moment I walked up to the building without her, looking for Alex Jones, (an acquaintance and one of the event organizers.) This fact will be provable in a new trial as there will be video evidence of my shouting to ask people in the crowd on the East Rotunda Porch of his whereabouts, as he had been there with a megaphone only moments before my repeated inquiries.

One gentleman on the porch said, "He's in the building." I said "bs" & he said "Don't you tell me bs, I saw him with my own two eyes. He's in that building." On his program a couple of days later, Jones recounted that his news organization had a permit to film the rally from the roof of the Capitol Building that day, (granting *him* rights to be there, in the building, and on its roof, no less.) But the timeline proves that not only were we *not* in DC on the 5th, but it shows what time we arrived on the 6th, all of our movements that day (which prove we did not participate in the march to the Capitol Bldg, but we ended up in Arlington looking for bathrooms.) It also

shows where we parked next to the Capitol Supermarket upon our return, located at 241 Massachusetts Avenue NE @ 1:57 pm.

Just before parking, we talked to a DC Metro Police officer, an African American lady before parking to make sure it was legal to park there, (We're not purposeful law breakers.) We told her we were there for the rally but she did not inform us that it had turned into a riot shortly before and that it was likely not safe to be there, a deliberate failure on her part to protect and serve. When we asked her if it was ok to park there, she actually said "I don't care what you do." Cameras in the area point to exactly where she was standing, which should make this fact verifiable. The timeline also shows we started walking away from the Capitol Supermarket towards the Capitol at 2:11 pm, and that we arrived onto the Capitol Grounds proper at 2:21 pm, which proves we had no knowledge of any kind of violence having occurred since we weren't notified by the officer, and we arrived after these things had already taken place. Mr. Dyke was made aware of this timeline early on, but he kept insisting that this factual, verifiable proof of our whereabouts and timing of such could only be used at sentencing to mitigate punishment time lengths.

Hopefully Your Honor, you won't allow this egregious handling of this case to befall me; everyone knows I'm not perfect, but I'm not an evil person, although I do believe that Mr. Dyke has (and possibly others have) done an evil to myself and my family. Regardless of what happens, God sees all and knows the truth. Some may be able to get their deeds past many and people get away with crimes every day, but none will escape His judgement in the end. In any event, it's not my viewpoint that someone in my shoes of having walked into a building without being named on a permit (while others were) necessitates my staring at 30 years in prison being as it is that during my time *in* the building I took it upon myself to try and lessen what I perceived to be imminent dangers to those working in the building and to help officers whom had also assessed those same dangers as being detrimental to their own wellbeing as they were working in the building, and to help them avoid such dangers as crimes (with the exception being the initial entrance of the building.) If anything, those actions were heroic in nature, though I have not once for the duration of this ordeal claimed to be a hero. I only did what I felt was the right thing to do in a really bad situation. Were there bad people there doing bad things? Yes. But I am not and should not be included in their number. I would hope you feel the same.

I beg you to consider all I have said here Your Honor. I would not want to anger you by coming a second time with this request, however, many things listed here I/we were unaware of (at the time of my first motion) and things and positions have changed in the light of these newfound truths. But these statements are truth, and I will swear under oath that they are. I agreed to the stipulated facts as being true because of Mr. Dyke's coercion, but I sincerely am telling you now, I, in my heart agreed with nearly nothing in those two felony charges, save the fact that I did enter the building. I say this with all due respect for you, for the law, and to the court. My intent is not for unjust delay, and this is not a game to me. I take it very seriously. I submit this

4

in honesty and pray you will not reject my plea. These are hard times which are not simple to understand for anyone. May God help us all to do right.

Respectfully submitted,

*[signature: Damon M. Beckley]*

Damon M. Beckley, pro se,

(Circle one) Notary | Justice of the Peace:

Signed *Stephanie Reynolds*

(Print) *Stephanie Reynolds*

*[Notary seal: STEPHANIE LYNN REYNOLDS, NOTARY PUBLIC, STATE AT LARGE, KY, ID KYNP42569, MY COMMISSION EXPIRES 1/28/2026]*

My commission expires 01 / 28 / 2026