## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-285-JEB** |
| **DAMON BECKLEY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Damon Beckley to 37 months of incarceration, 36 months of supervised release, restitution in the amount of $2,000, and a special assessment of $200. This sentence falls at the top of the defendant's Sentencing Guidelines range of 30-37 months and balances the factors articulated in 18 U.S.C. § 3553.

### I.       INTRODUCTION

The defendant, Damon Beckley, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Beckley breached the East Rotunda Door at 2:27 p.m., just minutes after the door's initial breach; he remained inside the Capitol building for over an hour. While inside, he demonstrated a lack of respect for law enforcement and their orders. He joined the angry mob in advancing toward a door that led directly into the House Chamber, where he witnessed a rioter break the windows of that door. While right outside the House Chamber, Beckley pleaded with officers to let him and the rioters into the Chamber, filming the officers raise their service weapons as they blockaded the door with furniture and attempted to protect the individuals who were still trapped inside the Chamber. Beckley exited from the Capitol at 2:57 p.m., but re-entered at approximately 3:15 p.m. as officers were actively attempting to clear the Capitol of the rioters. Instead of complying, Beckley physically impeded officers' ability to clear the Capitol by refusing to leave when instructed, resisting them as they attempted to push him out, and engaging in heated exchanges with the officers. When Beckley was forced out of the Capitol at 3:30 p.m., he gave an interview outside the East Rotunda Doors, stating, "We're not putting up with this tyrannical rule. If we gotta come back here and start a revolution and take all of these traitors out, which is what should be done, then we will."

The government recommends that the Court sentence Beckley to 37 months' incarceration, which is the top of the advisory Guidelines' range of 30-37 months for his convictions of 18 U.S.C. §§ 1512(c)(2) and 231(a)(3). A 37-month sentence reflects both the gravity of Beckley's conduct on January 6 and his lack of remorse for his actions.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Stipulated Facts in this case, ECF 52, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.9 million dollars.

### B.     Damon Beckley's Role in the January 6, 2021 Attack on the Capitol

*Pre-January 6 Social Media*

Prior to his participation in the violent attack on the U.S. Capitol, Beckley repeatedly posted on social media and advocated for political violence. On December 23, 2020, Beckley wrote on his Facebook account page, "THESE PEOPLE [referring to a fundraising website] ARE BEGGING FOR A CHARLIE HEBDO[2] STYLE MASSACRE. I will NOT be sad if it happens. You people deserve it. ZUCKERBURG, OBAMA, your days are numbered for this tyranny." (Figure 1, Government Sentencing Ex. A)[3].

---

[2] On January 7, 2015, two individuals attacked the offices of the French satirical weekly newspaper *Charlie Hebdo* in Paris, France. They killed twelve people and injured eleven others.
[3] Exhibits not previously introduced at the stipulated trial are marked alphabetically.

☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐  I posted the fundraiser straight from the "POST TO FB" b
on Fundly's site, which accesses your FB Account so they know you aren't fraudulently
posting or illegally accessing information or funds. THESE PEOPLE ARE BEGGING FOR
A CHARLIE HEBDO STYLE MASSACRE. I will NOT be sad if it happens. You people
deserve it.   ZUCKERBURG, OBAMA, your days are numbered for this tyranny. We
know you did this. (M.Z. met with BHO 63 or 64 times during Obama's terms to plan
big tech censorship, targeting Conservatives and Libertarians).   You guys are going
to piss the wrong people off with your ☐☐☐ & your reign of terror WILL get ended.
We're done with your tyrannical, unconstitutional high crimes and treason. Aren't you
jerks worried about your souls!?  #FireAndBrimstone #WailingAndGnashingOfTeeth
#10MtoDC Listen to the words of the prophet Dee Snyder fools:
https://youtu.be/ZTJc_Yt2Z4s

**Figure 1: Screenshot of Government Sentencing Exhibit A—Beckley's Facebook post from
December 23, 2020.**

Also in December 2020, Beckley made a post on Parler in response to an article about a

COVID relief bill recently passed by the U.S. Congress. In a comment brimming with violent

undertones, Beckley alluded to killing members of Congress, stating "It's not a slap in the face;

it's a DARE for hardened patriots to Charlie Hebdo these traitors and end their audacious

tyanny." (Figure 2, Government Sentencing Ex. B).



*Figure 2: Screenshot of Government Sentencing Exhibit B—Beckley's Parler post from December 2020.*

On December 27, 2020, Beckley wrote on his Facebook account page "Coups demand revolutions. Congress should be pulled into the DC streets Khaddafi[4] style! Multiple stolen terms; they're ILLEGETIMATE!" (Figure 3, Government Sentencing Ex. C).

---

[4] This is a reference to the violent murder of deposed Libyan leader Muammar Khaddafi on October 20, 2011.



**Damon Beckley**
Dec 27, 2020 · 🌐

Coups demand revolutions.
Congress should be pulled into the DC streets
Khaddafi style! Multiple stolen terms; they're
ILLEGETIMATE!
Trump should never have signed that OUTLANDISH
FREAKING BILL! He just gave them the money they
needed to keep prosecuting their war against us!
Screw this!

*Figure 3: Screenshot of Government Sentencing Exhibit C—Beckley's Facebook post from December 27, 2020.*

A day later, Beckley authored a similar post on his Facebook account, this time

encouraging his followers to join him at a rally in front of Senator Mitch McConnell's home in

Louisville, Kentucky (Figure 4, Government Sentencing Ex. D).

**Title** Coups demand revolutions. Congress should be pulled into the DC
streets Khaddafi style! Multiple stolen terms; they're
ILLEGETIMATE! Trump should never have signed that OUTLANDISH
FREAKING BILL! He just gave them the money they needed to keep
prosecuting their war against us! Screw this!  I'm going to be in
front of Mitch McConnell's Louisville KY home on Dundee Rd on the
2nd of January for the WON'T BACK DOWN RALLY. 1:30 – 4:15 PM.
BE THERE WITH ME!!! THESE TRAITORS HAVE TO BE
STOPPED!!!!!!!!!!!!!

*Figure 4: Screenshot of Government Sentencing Exhibit D—Beckley's Facebook post from December 28, 2020.*

In private messages sent through Facebook on December 28, 2020, Beckley encouraged

Person A to attend a rally at the home of Senator Mitch McConnell in Louisville, Kentucky on

January 2, 2021. During this exchange of messages, Person A stated, "must suck that Republicans are gonna be this mad at him now… they All have it coming." In response, Beckley wrote, "They're all traitors bro. Almost all of them. We gotta get back to the Constitution . . . If we can't get it done, it'll be time to Charlie Hebdo em bitches." (Figure 5, Government Sentencing Ex. E).

| Author | Damon Beckley (Facebook: 1159716681) |
|--------|--------------------------------------|
| Sent | 2020-12-28 20:01:22 UTC |
| Body | They're all traitors bro. Almost all of them. We gotta get back to the Constitution |
| Author | ███████████████████████ |
| Sent | 2020-12-28 20:01:34 UTC |
| Body | Sad |
| Author | Damon Beckley (Facebook: 1159716681) |
| Sent | 2020-12-28 20:01:37 UTC |
| Body | ^yep |
| Author | Damon Beckley (Facebook: 1159716681) |
| Sent | 2020-12-28 20:02:53 UTC |
| Body | It is. If we can't get it done, it'll be time to Charlie Hebdo em bitches! 🔫🔫 |

***Figure 5: Screenshot of Government Sentencing Exhibit E—Beckley's Facebook messages from December 28, 2020.***

### Beckley's Conduct on January 6

Damon Beckley participated in the January 6 attack on the Capitol, and his crimes are documented through a series of open-source videos, surveillance footage from inside of the Capitol, and his own photographs and videos.

Beckley traveled from Kentucky to Washington, D.C. "to protest . . . a stolen election." ECF 84 at 2. At approximately 2:27 p.m. on January 6, Beckley entered the Capitol through the East Rotunda Doors—only one minute after the doors were first breached—while police officers were attempting to protect the Capitol from the mob. Beckley was among the first group of rioters

to breach the building through the East Rotunda Doors. As captured on open-source video in Figure 6 below, Beckley witnessed extensive violence and chaos as law enforcement tried to prevent the rioters from breaking into the Capitol. Because of the sheer size of the crowd, they were unsuccessful, and thousands of individuals, including Beckley, took advantage of the mayhem and ultimately breached the Capitol.



*Figure 6: Screenshot from Stipulated Trial Exhibit 1. Beckley, circled in red, appears at 8:24.*

8

Beckley raced through the Rotunda and Statuary Hall before making his way to a hallway just outside the House Chamber doors at approximately 2:30 p.m. There, Beckley made his way to the front of a mob facing off against a line of police guarding the House Chamber. Beckley engaged in conversation with those officers, and told the crowd through a red megaphone, among other things, "Everybody listen now. Please, listen everyone. We have permission to go into this room, but you're going to have to be respectful and there can't be any violence okay?" (Figure 7, Stipulated Trial Ex. 2).



*Figure 7: Screenshot from Stipulated Trial Exhibit 2. Beckley, circled in red, appears at 2:54. The referenced quote can be heard at 6:05.*

Beckley was not, in fact, permitted inside the House Chamber. The mob, with Beckley still at the very front, violently pushed their way through the line of Capitol police officers at approximately 2:35 p.m., gaining access to the vestibule outside the House Chamber door. Beckley made physical contact with one officer while making his way into the vestibule. He surged forward alongside the mob, successfully breaking the police line, as he advanced toward the House Chamber door (Figure 8, Stipulated Trial Ex. 2). Beckley, still at the front of the mob, observed rioters break the glass panels of the House Chamber door and chant "Break it down!" Instead of

leaving, Beckley stood directly alongside the rioters as they damaged the door, tacitly approving their actions.



***Figure 8: Screenshot from Stipulated Trial Exhibit 2. Beckley, circled in red, surges past the police line.***

Inside the House Chamber, officers drew their weapons and barricaded the doors in a desperate attempt to prevent Beckley and the mob from breaching the House Chamber, where members of Congress and others remained inside. At approximately 2:40 p.m., Beckley used his cell phone to film videos through the shattered windows of the House Chamber door. In a nearly 9-minute video, Beckley remained outside the House Chamber door even though officers drew their service weapons and others inside the Chamber instructed him and the mob not to advance (Figure 9, Stipulated Trial Ex. 3). Beckley instead pleaded with the officers to let him into the House Chamber. He stated, "Open the door, brother. C'mon, man, open the door!" He also exclaimed, among other things, "I don't wanna get shot man, really. Please. We, we want, we just want our grievances redressed like the Constitution says, that's all." And, "C'mon, you guys. You guys are not going to lose a paycheck if we come in the building."

At approximately 6 minutes and 17 seconds into the video, Beckley, speaking to the individuals inside the House Chamber, stated, "I drove fourteen hours to get here and stood in the cold for three and a half hours to find out that Mike Pence is a fucking traitor, man. And I voted for that fucking dude." When another rioter exclaimed that Mike Pence was not a traitor, Beckley responded, "He could've done the right thing and certified those legislators, electors, and we wouldn't be standing here with a nine millimeter pointed at me right now!"

 

*Figure 9: Screenshots from Stipulated Trial Exhibit 3. Two law enforcement officers raise their weapons in the direction of Beckley and the mob through the shattered House Chamber door.*

In the same video, Beckley captured rioters arguing and screaming at the individuals in the House Chamber, shouting "We're real American citizens, and we're sick of this. We're making it known that we're sick of it." And, "If this doesn't happen, there's going to be a bigger Civil War

and a lot of bloodshed." As well as, "Go find another door, everybody" when it became clear that

law enforcement would not permit the rioters to enter the House Chamber.

    Beckley eventually was forced to leave the hallway outside the House Chamber by law

enforcement. While being escorted out of the area, Beckley turned around, got in the officer's face,

and yelled, "[D]on't push on me, man, I'm moving!" (Figure 10, Stipulated Trial Ex. 4).



*Figure 10: Screenshot from Stipulated Trial Exhibit 4. Beckley (red arrow above his head) is forced to leave the area near the House Chamber.*

    After officers forced the crowd to clear the area of the House Chamber, Beckley exited

from the Capitol through the East Rotunda Doors at approximately 2:57 p.m. At approximately

3:07 p.m., while outside the Capitol building, he recorded a selfie video in which he stated, "just

came out of the Capitol Building.  Had a nine millimeter pointed in my face by the fools in this

Congressional chamber." (Figure 11, Stipulated Trial Ex. 8).



*Figure 11: Screenshot from Stipulated Trial Exhibit 8.*

Nothing at this point, or any time prior, inhibited Beckley from leaving Capitol grounds. Instead, Beckley reentered the Capitol through the East Rotunda Door at approximately 3:15 p.m. and joined a crowd that congregated in the area between the East Rotunda Door and the Rotunda. At approximately 3:24 p.m., police begin physically attempting to clear rioters, including Beckley, out of the area. Beckley captured this incident on his cell phone, which showed a loud and chaotic scene, with rioters facing off with officers dressed in riot gear and holding shields (Figure 12, Stipulated Trial Ex. 5). Beckley can be heard at approximately 3 minutes and 23 seconds saying, "Let's go! C'mon! Let's push these fucks through!" as he advanced further into the Capitol toward the Rotunda alongside the mob.



*Figure 12: Screenshot from Stipulated Trial Exhibit 5. Beckley and the mob attempt to push past the police line toward the Rotunda.*

At approximately 3:26 p.m., Beckley remained inside the Capitol, in the area between the East Rotunda Door and the Rotunda. While in a throng of shouting and chanting rioters inside the Capitol, Beckley took a video of himself recounting the events which had just transpired. He stated, "So we're inside the Capitol building, ok? These traitors [at which time Beckley pointed the camera toward law enforcement] pointed their nine millimeters in my face. . . . We tried to get in the Congressional chamber and they shoved nine millimeters through the glass that we broke out. Actually somebody else broke it out, but I stood there and pushed that guy out of the way so that he wouldn't get shot." Government Sentencing Ex. F. He went on to say, "This is our country now in 2021! This is America!" Beckley then turned the camera toward the crowd, where he captured a scuffle between the rioters and police, as well as a female rioter chanting "Treason! Treason!"

One minute and twenty seconds into the video, Beckley captured a heated exchange between him and law enforcement (Figure 13, Government Sentencing Ex. F). The officer told Beckley, "If anyone was doing what you guys are doing, the response would be exactly the same. Ok? It doesn't matter who it is." Beckley responded, "You guys are on the wrong side right now." The officer replied, "When it comes to the Capitol, this is how it's done. No matter who it is. You're not just going to storm into the Capitol." Beckley continued to argue with the officers and physically impeded officers' ability to clear the Capitol by resisting them as they attempted to push him out and refusing to move when asked to leave by law enforcement (Figure 14, Stipulated Trial Ex. 6). Beckley got physically close to the officers and told them what they were doing was "not necessary." Beckley was eventually forced out of the Capitol at approximately 3:30 p.m.



***Figure 13: Screenshot from Government Sentencing Exhibit F. Beckley, on the right, argues with law enforcement inside the Capitol.***



***Figure 14: Screenshot from Stipulated Trial Exhibit 6. Beckley, circled in red, impeding officers' ability to clear the Capitol.***

After exiting the Capitol, Beckley was interviewed outside the East Rotunda Doors. He stated, "We're not putting up with this tyrannical rule. If we gotta come back here and start a revolution and take all of these traitors out, which is what should be done, then we will." (Figure 15, Stipulated Trial Ex. 7).



*Figure 15: Screenshot from Stipulated Trial Exhibit 7. Beckley speaks outside the East Rotunda Doors.*

In total, Beckley spent more than 1 hour inside the Capitol, and even longer on restricted Capitol grounds. His participation in the riot contributed to the mob's ability to delay the certification proceedings for hours. Members of Congress and the Vice President had to be evacuated and to take shelter while Beckley, among other things, stood shoulder to shoulder with rioters who tried to break into the House Chamber.

## III.   THE CHARGES AND STIPULATED TRIAL

On October 12, 2022, a federal grand jury returned a superseding indictment charging Beckley with 6 counts, including, 18 U.S.C. §§ 1512(c)(2) and 231(a)(3). On February 23, 2023, Beckley was convicted of those counts at the conclusion of a stipulated trial.

## IV.   STATUTORY PENALTIES

Beckley now faces sentencing on Counts One and Two.

As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces:

- Twenty years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a special assessment of $100 for Count One, Obstruction of an Official Proceeding; and

- Five years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, restitution, and a special assessment of $100 for Count Two, Civil Disorder.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. Id. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

### A.  Guidelines Analysis

The Guidelines analysis follows.

<u>Count One: 18 U.S.C. § 1512(c)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[5] | +3 |
| | | **Total: 17** |

---

[5] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Beckley corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

Count Two: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact w. Officer | +3 |
| | | **Total: 13** |

## B. Grouping Analysis

Under U.S.S.G. § 3D1.2, "closely related counts" group. The two counts of conviction do not group under § 3D1.2, because the counts involve different victims and harms. The victim of the Section 1512 offense is Congress, and the victim of the Section 231 offense are the victim officers. After this analysis, the revised Groups are as follows:

- Group 1: Count 1

- Group 2: Count 2

Under U.S.S.G. § 3D1.4(a) "the Group with the highest level" counts as "one Unit." One additional Unit is counted for "each Group that is equally serious or from 1 to 4 levels less serious." *Id.* Accordingly, Group 1 (offense level 17) counts as one unit. Group 2 (offense level 13) counts as one unit. Under the table set out in U.S.S.G. § 3D1.4, when there are 2 units, the offense level is increased by 2 levels. The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at USSG §3D1.4. Thus, the total combined offense level is 19.

## C. Acceptance of Responsibility

Beckley deserves no credit for acceptance of responsibility. U.S.S.G. § 3E1.1 requires that the defendant must "clearly demonstrate" acceptance of responsibility. Beckley repeatedly asserted after the stipulated trial that he should not have been found guilty of the felony convictions, violations of Title 18, Sections 231 and 1512. He moved for a new trial and asserted,

among other things, that he should only have been guilty of misdemeanors; that there was exculpatory information that would show he was not guilty of the felony offenses of conviction; and that he did not have criminal intent to enter the Capitol. *See* ECF 57. The Court denied the motion. *See* ECF 75. Despite the Court's ruling, Beckley again moved for a new trial in November 2023, *see* ECF 79, as well as a motion to compel grand jury transcripts and discovery materials, *see* ECF 80. In Beckley's affidavit in support of his motion for a new trial, Beckley asserts that he was "wrongfully convicted," ECF 82 at 3, and that he did not act "corruptly," *id.* at 6.

In Beckley's objections to the draft PSR, filed as recently as December 15, 2023, he continued to demonstrate a disturbing lack of remorse for his conduct on January 6. *See* ECF 84. Beckley disclaimed the idea that the mob, which he was a member of, forced entry into the U.S. Capitol by breaking windows and assaulting members of law enforcement. He asserted instead that "it has been determined through a wide number of news sources now that members of the FBI and other CHS's (confidential human sources as they are called) were the ones who first made these actions." *Id.* at 2. He also claimed that that there were "no police trying to prevent people from entering" the East Rotunda Doors during its initial breach.

Finally, throughout Beckley's filings, he tried to minimize his actions on January 6 by maintaining that he had assisted law enforcement. The evidence described above clearly shows otherwise. Beckley's conduct following the stipulated trial shows that he has not accepted responsibility.

### D.  Criminal History Category

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 63. Accordingly, based on the government's calculation of the defendant's

total adjusted offense level at 19, Beckley's Guidelines imprisonment range is 30 to 37 months' imprisonment.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

The Court should not apply § 4C1.1 here for the reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol

attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[6]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Beckley's felonious conduct on January

---

[6] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Beckley breached the East Rotunda Doors just one minute after its initial breach. He then made a beeline for the House Chamber, where he, once again, was at the forefront of a mob of rioters that overran a line of officers. Beckley stayed outside the House Chamber doors for a significant amount of time, filming the officers raise their service weapons in the direction of the mob and pleading with those inside the Chamber to allow him and his co-rioters to enter. All this occurred as members of Congress and other staff remained trapped and feared for their lives inside the House Chamber. Beckley remained inside the Capitol for over an hour and even longer on restricted Capitol grounds. The nature and circumstances of Beckley's offense were of the utmost seriousness, and fully support the government's recommended sentence of 37 months of incarceration, 36 months of supervised release, restitution in the amount of $2,000, and a special assessment of $200.

### B.  The History and Characteristics of the Defendant

The defendant has a history of arrests which weighs in favor of a lengthy period of incarceration:

- In 2002, the defendant was charged with Harassment in Louisville, Kentucky. According to the arrest report, the victim—the defendant's former wife—Beckley became angry when not provided with his son and grabbed the victim by the arm and shoulder and attempted to push her out of a doorway. The victim sustained injuries to her right bicep and lower back. The defendant was originally charged with 4th degree aggravated assault/spousal abuse. The case was dismissed in 2003. PSR ¶ 79.

- In 2016, the defendant was charged with 2nd degree Assault, 2nd degree Robbery, and 2nd degree Wanton Endangerment. The case was dismissed in 2018. PSR ¶ 82. The Government obtained records for this case and learned the following: The defendant was originally hired by Victim 1, a 74-year-old woman

at the time, to perform work at her home. Victim 1 paid Beckley, and he failed to perform the work. Victim 1 then hired Victim 2 to perform the work at her residence. Beckley arrived at the scene while Victim 2 was working. Beckley demanded his tools from Victim 1, and she refused to return Beckley's tools until Beckley refunded her money. Beckley then picked up a piece of decking lumber and swung the board at Victim 1. Victim 2 attempted to intervene in the altercation, and Beckley struck Victim 2 across the back of the head with a dry-wall brace. It is alleged that Victim 2 suffered a seizure and injuries to the front and back of his hand. Beckley took the property belonging to Victim 2, valued under $500, and left the scene. The Commonwealth of Kentucky moved to dismiss the case without prejudice because Victim 1's health prevented her from appearing in court to testify, and the case would not proceed to trial without her testimony.

Beckley's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a series of arrests and violent offenses. Beckley's criminal history demonstrates a propensity towards violence that is concerning.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Beckley's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Although Beckley has a criminal history category of I, his history of arrests is deeply concerning. While he was not convicted of these crimes, the allegations are very serious. When compounded with his behavior on January 6—especially his willingness to confront law enforcement and use his body to impede their efforts that day—the Government is concerned that Beckley will continue to resort to violence to further his political goals.

Beckley's statements online prior to January 6 show a disturbing pattern of violent rhetoric. Beckley repeatedly invoked the Charlie Hebdo massacre and the violent death of the deposed Libyan leader to describe what should be done to members of Congress. Finally, the defendant has yet to accept responsibility for his actions on January 6 as evidenced by his *pro se* filings after his conviction. The defendant has consistently attempted to minimize his conduct on January 6 and has maintained that he has done nothing wrong. These factors demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his history of violent assault and rhetoric and his lack of accountability for his actions on January 6.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by

professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give

"respectful consideration to the Guidelines." *Id.* at 101.

     **F.**    **Unwarranted Sentencing Disparities**

     Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United

States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-

disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United

States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel

Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out

generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.")

(statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr

at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

27

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

There are many similarities between *United States v. Strand*, 1-cr-85, and the instant case. Like Beckley, Strand was one of the first people who breached the Capitol through the battered East Rotunda Doors; he made a beeline for the House Chamber, eventually making it to the House Chamber doors, standing mere feet from Beckley; he witnessed a fellow rioter break the windows in the House Chamber Doors; and like Beckley, Strand was eventually forced to leave the hallway outside the House Chamber by law enforcement. Strand finally exited the Capitol building 48 minutes after entering. On the Capitol Steps, Strand took a series of selfies, made a vulgar gesture at the besieged police officers, and boasted on Twitter about having stormed the Capitol. Strand was charged with 18 U.S.C. § 1512(c)(2) as well as the four standard misdemeanors. He was sentenced to 32 months' incarceration following a jury trial.

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Beckley's conduct is more egregious and is distinguishable in a few important ways. First, Beckley, unlike Strand, made several violent statements on social media about Congress prior to January 6. Second, Beckley played a more prominent role in the riot, acting as a spokesperson and leader of the mob, evidenced by the fact that he was consistently on the front lines of the rioters and engaging officers directly. Finally, Beckley, unlike Strand, is charged with an additional felony—18 U.S.C. § 231(a)(3)—for the physical contact he made with officers as he impeded their efforts to protect and clear the Capitol.

Beckley may also be compared to Landon Mitchell. In *United States v. Landon Mitchell*, 21-cr-508, Mitchell planned for conflict in advance of January 6. Leading up to January 6, Mitchell made several posts on social media about the 2020 presidential election. Mitchell and his co-defendant traveled together to the former President's "Stop the Steal" rally, marched to the Capitol, and made their way onto restricted Capitol grounds. Mitchell "climbed the scaffolding up 3 stories, pushed back the police and breached the doors!" Mitchell stated in Facebook messages to his friends and family members that he "Breached the Capitol today," that he was "one [of] the very first in," and "one of the first to Breach." Mitchell then unlawfully entered the Capitol building, went into the Rotunda, made his way down several hallways, and eventually walked into the Senate Chamber and onto the Senate Floor. Mitchell leafed through and examined documents on Senators' desks, ascended the Senate Dais, and posed for pictures, including ones taken next to the self-proclaimed "QAnon Shaman," Jacob Chansley. Mitchell was convicted of 18 U.S.C. § 1512(c)(2) and five misdemeanors following a stipulated trial. With a criminal history category of IV, Mitchell was sentenced to 27 months' incarceration.

Beckley's conduct is distinguishable in a number of ways. Like Mitchell, Beckley advanced to one of the most sacred parts of the Capitol building—the House Chamber. While Beckley did not make it inside the Chamber like Mitchell did, Beckley's conduct outside the House Chamber is arguably more dangerous. Beckley remained outside the House Chamber door as law enforcement raised their service weapons in his direction in an attempt to protect several members of Congress and other individuals who were still trapped inside the Chamber. On the other hand, the Senate Chamber had been evacuated by the time Mitchell breached its floors. In addition, while both Beckley and Mitchell demonstrated a lack of remorse for their actions on January 6, the United States found that Mitchell was entitled to a three-point adjustment for acceptance of responsibility. Finally, Mitchell was not charged with any other felonies, unlike Beckley. Beckley's conduct is more egregious in that he continually impeded officers' ability to do their job on January 6 and made physical contact with them in furtherance of his intent to obstruct the certification proceedings.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But because Beckley was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019)

(quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Beckley to pay $2,000 in restitution for his convictions on Counts One and Two. This amount fairly reflects Beckley's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 37 months of incarceration, 36 months of supervised release, restitution in the amount of $2,000, and a special assessment of $200.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   */s/ Julie Bessler*
Julie Bessler
PA Bar No. 328887
Assistant United States Attorney
601 D Street N.W.
Washington, D.C. 20530
(202) 809-1747
Julie.Bessler@usdoj.gov

Jason M. Manning
NY Bar No. 4578068
Trial Attorney, Detailee
1400 New York Ave NW, 11th Floor
Washington, D.C. 20005
(202) 514-6256
Jason.Manning@usdoj.gov