UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 21-cr-00285-JEB |
| ) | |
| DAMON MICHAEL BECKLEY ) | |
| ) | |
| Defendant ) | |

**DEFENDANT DAMON BECKLEY'S SENTENCING STATEMENT**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
Attorney for Defendant

I.  **Introduction**

Comes now Defendant Damon Beckley, by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing set for February 9, 2024.

Mr. Beckley appears for sentencing before this Court having been convicted in a "Stipulated Trial" on Counts One and Two of the Superseding Indictment, violations of 18 U.S.C. Sec. 1512(c)(2) and Sec. 231(a)(3), respectively.

Based on a consideration of his conduct, the Probation Officer has recommended a Guideline Range of 24 to 30 months based on the application of the Sentencing Guidelines to that conduct.

II.  **The Offense Conduct**

Given that the convictions are based on a stipulated set of facts that were submitted to the Court, and that the Presentence Report accurately recounts those facts.

However, as Mr. Beckley claimed while representing himself following the stipulated trial, Mr. Beckley believes additional factual information should be before the Court as part of the Stipulated trial, and had an expectation that his attorney would be allowed to present that evidence in addition to the stipulated evidence submitted jointly by the parties.  Mr. Beckley believes this additional evidence was both exculpatory as well as mitigating.

While representing himself, Mr. Beckley submitted some of this information as part of his various post-trial motions.  The Court reviewed the

information, and denied his motions on the basis that the evidence put forward was not "exculpatory" in the sense that it did not suggest "actual innocence" on the part of Mr. Beckley with respect to the offense conduct for which he was convicted. If the evidence was relevant but only on the issue of mitigation, that evidence is properly considered for purposes of sentencing pursuant to Sec. 3553, and with regard to "relevant conduct" under the guidelines.

Mr. Beckley has submitted to Counsel the following information that he wishes to have before the Court for purposes of sentencing. Mr. Beckley has requested that Counsel not edit this information other than for style and grammar purposes.[1]

That information is summarized as follows:

### Damon M. Beckley's January 6th, 2021 Experience

• Left south central Kentucky from the Bowling Green Walmart around 12:00 midnight.

• Reached the Mall in Washington DC at 10:16 AM EST.

• Participated in the rally until 1:10 PM and left early in search of restrooms.

• Accidentally got on the wrong ramp driving and went into Arlington looking for restrooms.

---

[1] Given the undersigned Counsel's late entry into this case, and not having been involved in the stipulated trial or the post-trial motions filed by Mr. Beckley while representing himself, counsel has opted to respect Mr. Beckley's wishes in this regard, and the information is submitted without substantive modifications. Counsel would like to emphasize, as done in more detail in the body of this Statement below, it is Counsel's view that Mr. Beckley is not attempting to escape responsibility for his actions, but rather – as has always been the case – Mr. Beckley believes that important evidence was not put before the Court at the time his guilt was determined. Whether the failure to do so is a deficiency in the performance of prior counsel is a subject to be addressed later in a different context. But Mr. Beckley believes – and counsel concurs – that this information is at least relevant to mitigation and is properly presented here without impacting his willingness to accept responsibility for his conduct on January 6, 2021.

- Came back into DC via another bridge, found restrooms on the southeast corner of the Mall in Ladybird Johnson Park (handicap porta potties).
- Left there to search for a place to park somewhat close to the Capitol Building (where the rally was supposed to commence) and asked a female police officer at the intersection just east of (or maybe south) the Capitol Supermarket.  We told her we were there for the rally and asked her at approximately 1:49 PM if it was ok to park there to which she replied "I don't care what you do."  We were not told that the scene at the Capitol had already begun to descend into chaos, but it seems she should have probably known that by 1:49 pm.
- We parked and walked towards the Capitol Bldg and arrived at the grounds at approx. 2:19 pm.
- We heard Alex Jones trying to get people to go to the south side of the building, but were unable to hear his directions because we only heard half of his sentence – only the part about the destination, not how to get there.
- Alex Jones is an acquaintance of mine, so I went to the top of the stairs on the East Entrance steps to see if I could locate him, but I didn't see him.  I was told by someone near the entrance that he had entered the building.  After approximately 1 – 2 minutes, I entered the building to go look for him.  As it turned out, his organization had a permit to be filming from the roof, so he had gone immediately up the stairs after his entrance and I never found him.
- No policemen were stopping anyone from entering the room, although they were there, standing to the side.  I saw many people I would call agitators in the room, shoving people around like they were at a punk rock show.  I was

momentarily knocked down and subsequently trampled for a few seconds until some people behind me helped me up to my feet.

• Not wishing to be a part of this any further, I turned on my camera and started filming the events that were unfolding.

• When I went into the very next room, the Rotunda, I was immediately knocked down violently from behind by what I think was an Antifa operative. In the process, my camera went flying across the floor and was stolen. I landed very hard and tore my hand up sliding across the floor tiles.

• I was still looking to find Alex Jones at this point. After getting up I headed in the direction of crowd noise that I could hear ahead. In the hallway leading to the House Chamber a small crowd of 40-50 or so had gathered at a police line. I approached the police line to inquire what was going on and the crowd was being very unruly. Having read on the Constitution some, I asked one of the officers if I could get the crowd to calm down, could we (the people in the crowd) go into the House Chamber to address Congress and have them redress our grievances as per the Constitution. A few minutes later, after conferring with the Congressional Special Detail on the logistics, the officer came back and said that it was a go.

• I asked the crowd if anyone had a megaphone. Someone handed me one, so I attempted to get the crowd to calm down and commit to no violence. John Sullivan aka "Jaden X" captured this on video.

• While trying to calm the crowd, activists within the crowd rushed the police line. I was facing the crowd, standing alongside the police and we all had to run from the crowd together, towards the House Chamber doors.

- I walked closer to the doors which were closed.  Someone in the crowd had handed a professional door breaching tool over the heads of the crowd.  It was handed to me.  I took one look at it and thought, "Why is this here?" and I sat it in the corner.  A younger dark-haired guy picked it up and bashed the glass out of the right door
- While standing in front of the door on the left, my rain jacket was covered in a very fine plume of minute glass shards.  With all of the chaos, I didn't grasp what had just happened until a couple of days later, but the door had been shot at by someone inside the House Chamber.  Thank God for bulletproof glass.
- After 20 or so minutes, 16 USCP officers, led by Lt. Robert Rohm, came into the area and forced their way through the crowd, (that at this time it had gotten huge) and tried to push them back.  They were armed with graphite batons only, so they were not effective at moving the crowd away from the doors.  Then the crowd bore down hard against the officers.  I was having a conversation face-to-face with Lt. Rohm so when the crowd (at my back) started ramming forward, myself and the 16 officers (and a small handful of others) were getting crushed.  A younger officer started to panic (It was obvious that the officers were losing the shoving match) and he fearfully exclaimed to Rohm, "What are we going to do?"  Lt. Rohm told me and one other gentleman, "Make a hole and we'll get out."  We did it right away.  I knew there were armed officers inside the Chamber and some people were attempting to stay behind, so I yelled at them and told them to get out.  One guy said "They can't kill us all" and I told him "Don't be stupid."  I made the hole, but at each new area,

Rohm repeated the directive, so I would clear the next area and go back to him to report.  We did this all the way through 6 areas to the East Entrance as hundreds more people were entering the building, (Not easily done without a megaphone.)  Once there, Lt. Rohm directed me to go out on the porch and make another hole.  I did and returned.  He said, "No.  I meant all the way down to the ground."  So I went out to the edge of the porch, acquired another megaphone and got people on the steps to move, then once again returned to Lt. Rohm.

• After this I stood outside the door talking to Lt. Rohm.  Those at the door were shoved back into the building by some very forceful people shoving me into Lt. Rohm.  He and I quickly moved to the left.  At this time I asked another gentleman if I could use his megaphone, but he was unwilling to comply with my request.  He wanted to know what I was going to say.  I told him and he said, "These people already know that" to which I replied "What is there to do then?" Him and another guy said "What is there to do?  Go into Nancy Pelosi's office and destroy it!"  Obviously I wasn't going to do that.

• Immediately after that, one guy says, "Help me out.  We've got to push." They stated chanting "USA USA USA" and while people were chanting with them, he screamed at his comrades "Push these f+#@s through!"

• After getting shoved across the room, I found my way out.  A young kid came out crying and said "They killed a girl in there."  I said "What?"  He said, "I've got it on my phone."  He showed it to me.  I was upset, so after being knocked down 5 separate times & hearing about Ashli Babbit, I went off on camera to a small independent news team.  The video went viral.

• Shortly after that, I rejoined my wife and brother-in-law (neither of whom entered the building) and we left and went to a hotel in Virginia, then left the next morning for home.

## **SENTENCING GUIDELINE CALCULATION**

The Probation Officer has calculated a Total Offense Level of 17, including a two-level reduction for being a "Zero Point Offender."

With a Criminal History score of 0, the Defendant is in Criminal History Category I.

As calculated by the Probation Officer, the recommended guideline range is 24-30 months. The Probation Officer recommends a downward variance to a sentence of 18 months based on outcomes in similar cases involving similarly situated defendants and similar facts and circumstances of surrounding the offense conduct.

The Defendant agrees with the calculation done by the Probation Officer, with one exception – the Defendant should receive a two-level reduction for acceptance of responsibility, making the total offense level 15. The recommended Guideline Range at Level 15 would be 18-24 months.

With the agreement to the factual basis for the Stipulated Trial the Defendant did accept responsibility for his conduct. He did not falsely deny actions taken by him or put the Government to the burden of proving that conduct.

Even to the extent that his post-trial actions might suggest a failure to accept responsibility – while representing himself without full appreciation of the potential adverse consequences of pursuing a new trial motion – the nature

of his post-trial efforts was simply to get additional information before the Court that he expected would be presented by his counsel at some point in the stipulated bench trial process. Whether he was earnestly mistaken in that regard by virtue of something said to him by his counsel is a question to be resolved in another proceeding. Current counsel for Mr. Beckley explained that he will have an opportunity to explore those issues further post-sentencing and seek appropriate relief if warranted.

For purposes of sentencing, the additional information adds to, and does not meaningfully contradict the factual basis that Mr. Beckley admitted to for the stipulated trial.[2]

As set forth in more detail below, Mr. Beckley requests that this Court vary downward by 4 levels, to Offense Level 11. That would place him in Zone B of the Sentencing Table and authorize this Court to impose a sentence of probation that includes as a term or condition that he serve a period of community confinement, intermittent confinement or home detention. The recommended Guideline Range would be 8-14 months.

The Defendant suggests that a sentence of 24 months probation, including a term that 8 months be served under the condition of home confinement, accomplishes all the purposes contemplated by Congress in 18 U.S.C. Sec. 3553.

---

[2] With regard to Mr. Beckley's claims regarding having been under the influence of medication on the day of the stipulated trial and not fully understanding the process as a result – claims which this Court has rejected – those only go to the issue of whether Mr. Beckley knowing and intelligently went forward with the agreed-upon process for disposition. The do not involve a false denial by Mr. Beckley of the factual admissions made for purposes of the stipulated trial and therefore should not adversely impact the issue of acceptance on his part for purposes of sentencing.

### III.  Sentencing Factors Under Sec. 3553(a)

Pursuant to 18 U.S.C. § 3553(a), the numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to Mr. Beckley's background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

> 1. Nature and circumstances of the offense and the history and <u>personal characteristics of the defendant</u>.
>
>    a. <u>The Nature and Circumstances of the Offense</u>.

As many Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be categorized as having three primary constituent parts:

1) a relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence to disrupt the congressional certification of the 2020 Electoral Vote.

2) a larger number of protesters who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with the reported outcome of the 2020 Presidential election -- but with no predetermined intention to engage in violent behavior towards law enforcement or any other individuals.  Some substantial number of these individuals were drawn into committing acts of violence once on the Capitol grounds or inside th Capitol itself; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.

The facts applicable to Mr. Beckley's conduct on January 6, 2021, place him between the second and third groups, notwithstanding his entry into the Capitol. Rather than be contradicted by his encounters with law enforcement, those interactions actually support the conclusion that he came to Washington D.C. to attend a rally and protest, but nothing more. He entered the Capitol building in search of Mr. Alex Jones – having been told Mr. Jones had just gone inside -- and for no other purpose. When he came upon the doors to the House Chamber he asked to enter for the purpose of seeking "redress for grievances" as he believed is provided for in the First Amendment. He did not seek to break down the doors or the glass with other members of the crowd, and he did not involve himself in efforts to overrun a police line. The evidence shows Mr. Beckley in conversations with police officials, as well as in efforts to help calm the crowd, and there is no evidence that he failed or refused to follow the instructions when told what to do.

These facts are all accounted for by the Probation Officer's recommendation for a downward variance from 24 to 18 months.

      b. <u>History and Personal Characteristics of Mr. Beckley</u>.

The PSR accurately captures Mr. Beckley's biographical history and the circumstances of his life currently.

Much of the information that Mr. Beckley wishes the Court to know for purposes of mitigation is set forth in his supplement to the Offense Conduct Section above.

Additional video evidence that Mr. Beckley believes the Court should see prior to imposing sentence are also submitted along with this Statement.

DEFENDANT'S SENTENCING RECOMMENDATION

Damon Beckley and his wife came to Washington D.C., on January 6 to attend the Stop the Steal rally at the Ellipse. After the rally they drove their car first into Virginia by mistake, and then back to the Capitol where he parked nearby. He was unaware of the large crowd that had marched from the rally to the Capitol. He entered the Capitol on the east side of the building unaware of the massive crowd battling with Police on the west side of the building. While inside he engaged in no acts of violence or destruction of property. He conversed with law enforcement officers in a calm manner, and at times tried to help calm more agitated members of the crowd. Even though he entered the building twice, each time he responded to law enforcement direction that he leave.

Mr. Beckley does have a pattern of contact with law enforcement, but none of those encounters result in criminal history points as set forth by the Probation Officer.

Besides recent traffic infractions – most involving speeding in rural areas of Kentucky – the balance of contacts with law enforcement are two decades old or more. Mr. Beckley understands that while on probation, any further violations of law could result in him going into federal custody for having violated the terms of his probation.

Because a sentence of probation is authorized if a term of that probation is a period of home detention equal to at least the minimum term, Mr. Beckley

requests a sentence of two (2) years probation, which shall include a condition that he be subject to 8 months of home detention.

    This sentence is appropriate under the facts, it is appropriate under the Sentencing Guideline calculations, and it takes into consideration the relevant 3553(a) factors that are present.

Date: February 5, 2024                    Respectfully Submitted,

                                          /s/ William L. Shipley
                                          William L. Shipley
                                          PO Box 745
                                          Kailua, Hawaii 96734
                                          Tel: (808) 228-1341
                                          Email: 808Shipleylaw@gmail.com
                                          *Attorney for Defendant*